CLONEY v. CITY OF KALAMAZOO.[1]

MUNICIPAL CORPORATIONS — EXCAVATION IN STREET — INJURY TO PEDESTRIAN—CONTRIBUTORY NEGLIGENCE.

> Where plaintiff in an action against a city for injuries sustained by falling into an excavation in a street, at a crossing, knew that the street was being torn up near the crossing, and approached the crossing in the night-time, when there was sufficient light to have seen the condition of the street, but walked off the sidewalk without looking, the court should have directed a verdict for defendant, since plaintiff was guilty of contributory negligence. MONTGOMERY, C. J., dissenting.

Error to Kalamazoo; Buck, J. Submitted June 5, 1900. Decided September 24, 1900.

Case by Morgan Cloney against the city of Kalamazoo for personal injuries. From a judgment for plaintiff, defendant brings error. Reversed.

[1] Rehearing denied November 19, 1900.

*L. N. Burke* and *Dallas Boudeman*, for appellant.

*N. H. Stewart* and *E. M. Irish*, for appellee.

LONG, J. It appears that the defendant city, in the summer of 1896, contracted with certain parties to pave Burdick street. That street crosses Main street at right angles, and is 66 feet wide. Main street is 100 feet wide. Prior to September 1, 1896, the pavement had been completed up to the north line of Main street, leaving only the intersection of the streets to complete the pavement. Burdick street had formerly been paved with cedar blocks, and, in doing the work of repaving, the contractors took up those blocks and a few inches of dirt, and filled the space with about 6 inches of broken stone and 2 inches of sand, and upon that foundation laid the brick. Labor Day came on the first Monday of September, and, the authorities being desirous of completing the work before that time, it was arranged that the contractors should continue to work day and night to complete the balance of the paving. On September 2d the contractors began tearing up the intersection of the streets. This work continued during the day and until 10:30 o'clock that night. It is the claim of the plaintiff that about 8:30 o'clock that evening, as he was walking west on the north side of Main street, and as he started to cross Burdick street, he stepped into an excavation caused by tearing up the pavement on the street, and was severely injured thereby, and the result thereof was to produce a double inguinal hernia. This suit was brought to recover damages, and on the trial he received a verdict for $5,000. Defendant brings error.

The main contention of defendant's counsel is that the evidence shows that plaintiff was guilty of contributory negligence, and that therefore the court should have directed a verdict in favor of defendant. It appeared that plaintiff was a merchant doing business on Burdick street. The pavement had been laid past his store before the accident. He saw the work going forward, knew it

was being done, and must have known that, in order to do the paving, the street would have to be excavated to some depth. On the evening in question he passed down Burdick street to the corner of Main street. McDonald's drug-store is situated on the corner. Plaintiff turned east on Main street a few rods to visit a place of business, and a short time thereafter he returned westward along Main street. Arriving at the corner of Burdick and Main streets, he attempted to continue directly across Burdick street. The pavement had been torn up at that crossing, as it was a part of the street that was to be finished that night. It was dug and plowed up and excavated to some depth close to the curb, and plaintiff, at once on stepping beyond the curb, fell into the excavation. At that time two arc lights were burning. One was 56 feet north of the place of the accident, and one was hanging over the center of that part being paved. Lights were also burning in McDonald's drug-store. Plaintiff testified as follows:

"*Q.* You then came down to the corner, to the east side of Burdick and Main, to McDonald's drug-store?

"*A.* Yes, sir.

"*Q.* And did you notice that they were working there in the street when you got down there to the store [meaning McDonald's drug-store]?

"*A.* Yes; I noticed Taft plowing out there in the center of the street. That's all the men or teams I saw there. He was plowing dirt up by the bricks on Main street, about opposite to McDonald's,—somewhere south of McDonald's, on Main street. The team, I think, was on the cross-walk leading from McDonald's south towards the First National bank. The team was headed east when I saw them.

"*Q.* Did you stop and look at them awhile?

"*A.* Yes; I stopped and looked at them, and saw the team working over there. That was before I went up to the Building & Loan. I might have stood there looking at them working in the street five minutes. I stood in front of McDonald's drug-store, east of the corner of Main street.

"*Q.* They had taken out some dirt, had they, in the street?

"*A.* I didn't notice whether they had or not. I know they were plowing it up. I didn't notice whether they had drawn out any or not.

"*Q.* You noticed they had the whole corner ripped up there, didn't you?

"*A.* I didn't pay any attention to it; I was looking at the team.

"*Q.* You could have seen that, all right?

"*A.* Probably I could if I went and examined it. I was looking at the team. I didn't pay any attention to anything else.

"*Q.* You could not help, when you saw the team— What were you looking at the team for?

"*A.* They were plowing. They were not drawing any dirt, I think.

"*Q.* Was there anything singular about the team, that called your attention to it?

"*A.* Yes, sir; there was.

"*Q.* What was it?

"*A.* They worked so steady over those tiles, and among that iron and track; that's what I was looking at.

"*Q.* You could see that the whole corner at the intersection was disturbed, couldn't you?

"*A.* I didn't pay any attention to it?

"*Q.* Why didn't you?

"*A.* Because I wasn't looking at it; I was looking at the team.

"*Q.* There wasn't anything to prevent you seeing it?

"*A.* I don't know whether there was or not.

"*Q.* What was there, if anything, to prevent your seeing exactly what condition the street was in?

"*A.* I don't know as there was anything, if I had looked at it, but I didn't take any pains to look out that way; all I was looking at was the team.

"*Q.* Didn't have any difficulty in seeing the team there?

"*A.* No, sir; they were a gray team.

"*Q.* You didn't have any difficulty in seeing the man who was driving the team, did you?

"*A.* No, sir. * * *

"*Q.* When you came down the street, what did you do?

"*A.* I started to go right up to Cobb & Hunter's.

"*Q.* Did you stop at the corner there at the time?

"*A.* No, sir; I went straight on.

"*Q.* Did you look around to see what they were doing at the street then?

"*A.* I did not; no, sir.

"*Q.* You didn't pay any attention then; you just—

"*A.* [interrupting]. I went right on.

"*Q.* Where were you looking?

"*A.* Well, I was— I don't know where I was looking. I was looking ahead, I presume. I don't think it was quite as light when I came from the Building & Loan Association up to the corner. It was getting darker all the time,—some darker. I was probably down there 5 or 10 minutes. There were people standing there on the corner when I came up from the Building & Loan Association. I didn't notice who they were. They were not standing near to this cross-walk.

"*Q.* As you came along up to the corner on the east side of that street, near this cross-walk, didn't you look to the south, to see Taft's team working there?

"*A.* No, sir; I don't think I did.

"*Q.* Did you look over towards where the team was working?

"*A.* Don't think I looked that way at all.

"*Q.* What makes you think you didn't?

"*A.* Because I was going right up there. I started up there, and I went right along through there.

"*Q.* Was that the only reason that makes you think you didn't look at them?

"*A.* That's the only reason,—because I had my mind fixed on going there, and I went there.

"*Q.* Your eyesight was good at that time?

"*A.* Yes; better than it is now.

"*Q.* It was dark that night?

"*A.* Yes, sir; fair. It was dusk,—not as bright as day, not by any means.

"*Q.* Well, it was light enough so anybody could see what was going on there,—see the street and the people?

"*A.* The people standing on the walk, you could see them; yes.

"*Q.* And you could see people in the street, couldn't you?

"*A.* I didn't notice anybody in the street.

"*Q.* You could have seen—

"*A.* [interrupting]. If I was looking that way, I might; yes.

"*Q.* And you could see whether the street was torn up?

"*A.* Well, I didn't pay any attention to the street.

"*Q*. You stepped on the curbstone, did you?

"*A*. I don't know whether there was a curbstone there or not.

"*Q*. What?

"*A*. I didn't step on any curb, as I know of.

"*Q*. Wasn't there one there?

"*A*. I don't know whether there was a curb there or not; I didn't notice any.

"*Q*. Where did you go from McDonald's walk onto this cross-walk?

"*A*. I went straight west. .

"*Q*. Well, were you, or were you not, about in the center of the cross-walk?

"*A*. I should judge about in the center.

"*Q*. There was nothing there that obstructed your view at all as you came up to the corner of McDonald's drugstore? You could see where this cross-walk once had been or was?

"*A*. If I was looking for it, I might; yes. But I always propose to walk about in the center of the sidewalk."

The plaintiff testified further that he did not know of any change in the condition of the crossing until he fell into the excavation, and that he did not see any light at the time he fell. He also gave evidence tending to show that an arc light was suspended over the middle of the cross street, but it was swung down very low that night, to light the workmen in the middle of the square, and that objects easily came between it and the crossing, so as to throw the walk into shadow; that at times it did not burn evenly, but sputtered and threw shadows.

The court below, on the plaintiff's own testimony, should have directed the verdict in favor of defendant. Counsel for plaintiff, however, contend that the case is governed by *Dundas* v. *City of Lansing*, 75 Mich. 509 (42 N. W. 1011, 5 L. R. A. 143); *Argus* v. *Village of Sturgis*, 86 Mich. 344 (48 N. W. 1085); *Brezee* v. *Powers*, 80 Mich. 172 (45 N. W. 130); *Finn* v. *City of Adrian*, 93 Mich. 507 (53 N. W. 614); *Graves* v. *City of Battle Creek*, 95 Mich. 266 (54 N. W. 757, 19 L. R. A. 641, 35 Am. St. Rep. 561).

The circumstances of the injury in each of those cases were very different from the present case. In *Dundas* v. *City of Lansing* it appeared that the plaintiff was not thinking of the hole in the walk. The night was dark and stormy, and a slight snow or mist was falling. It was there said, however:

"Many cases are reported where, under the circumstances attending the transaction, courts have rightly held that the party was not entitled to a recovery where the danger was apparent and known, and the injury resulted from his own carelessness and inattention."

In *Brezee* v. *Powers* it appeared that the night was quite dark. There was nothing to call the plaintiff's attention to the fact of the opening into which he fell. In *Finn* v. *City of Adrian* it appeared that the plaintiff knew, eight days before the accident, that the walk had been partially torn up, and that the street was being paved. That was held not sufficient to charge her with contributory negligence in attempting to cross the walk, as she had the right to assume, in the absence of any danger signal, that the walk had been placed in good condition. In *Graves* v. *City of Battle Creek* the theory of the plaintiff was, and she gave testimony tending to show, that, just before she stumbled over the plank in question, she heard a whistle, and became frightened and hurried on. It was said:

"The court should have submitted to the jury the question of whether this circumstance, coupled with the fact that it was in the night-time, was sufficient to excuse her immediate attention to the walk at the exact time of the injury."

In the present case the plaintiff knew that the street was being paved. He saw the teams and men there at the very time (although it was in the night) doing the work of grading, and he says that, when he went down, he stopped and looked at the team plowing; and, being asked if he "noticed that they had the whole corner ripped up," he answered, "I didn't pay any attention to it; I was

looking at the team." In a few moments afterwards he returned. He was asked if on his return he could see if the street was torn up, and replied: "Well, I didn't pay any attention to the street." He was asked if he stepped on the curbstone, and answered: "I don't know whether there was a curbstone there or not. I didn't step on any curb, as I know of. I didn't notice any." It is apparent from the testimony of plaintiff that, had he looked, he could have seen that the street was torn up. He did know that it was being torn up, and that the men were working there. He attempted to cross without giving any attention to the condition of the street, or taking any precaution to avoid injury. It was held in *Irion* v. *City of Saginaw*, 120 Mich. 295 (79 N. W. 572), that one who had in mind the bad condition of the cross-walk leading from the street curb to the sidewalk, and knew that if she went over it she must exercise great care, and take the chances of going over in safety, and who, by stepping aside a few feet, could pass along without going on the walk, was barred by contributory negligence from recovering for injuries received in crossing it. In *Church* v. *Village of Howard City*, 111 Mich. 298 (69 N. W. 651, 66 Am. St. Rep. 396), it was held that a pedestrian, perfectly familiar with existing conditions, was, as matter of law, guilty of contributory negligence, precluding a recovery for injuries sustained by falling from the side of a walk, unguarded by a rail, into an excavation, during the night-time, where, instead of guiding himself by a rail on the other side, he directed his course by a light which proved not to be the one he supposed it to be. In *Grandorf* v. *Railway Co.*, 113 Mich. 496 (71 N. W. 844), it was held that one who in the daytime attempted to pass over stones which she saw scattered over the sidewalk assumed the risk of injury. While the present case does not present the exact state of facts presented in those cases, it does present facts which lead us to the conclusion that, had the plaintiff exercised the least care, he would not have met with the accident complained of. He walked heedlessly into danger, knowing that the street was being torn up.

The judgment must be reversed, and no new trial ordered.

HOOKER, MOORE, and GRANT, JJ., concurred with LONG, J.

MONTGOMERY, C. J. (*dissenting*). The concurrence of my brethren in the view that there was no case for the jury would lead me to doubt my judgment, were it not for the fact that the supreme court of Massachusetts has but recently dealt with a case which in principle is not to be distinguished from the present. In *O'Neil* v. *Hanscom*, 175 Mass. 313 (56 N. E. 587), the court uses this language:

"Assuming, according to the sixth request, that there were around and at or near the trench sufficient lights, horses, and barriers to warn the plaintiff of danger, and the plaintiff saw them and did not heed them, it cannot be said, as matter of law, that he thereby assumed the risk of falling into a trench of whose existence, so far as appears from the instruction requested, he was, or might have been, ignorant."

In the present case it is true that the fact that the plaintiff knew that the authorities were working in Burdick street and in Main street may furnish ground for a strong inference that he knew that the crossing of Burdick had been removed; but does it conclusively show that he knew it? I think not. He testifies that, when he last knew the fact about it, the crossing was intact. I do not think it should be held, as matter of law, that, because he knew that teams were at work on the opposite side of Main street, he must be assumed to have known, or bound in law to have known, that the cross-walk had been removed and left in a dangerous condition. No barrier was erected, and no direct warning given. I think the case was one for the jury.