VINCENT *v.* CITY OF DETROIT.

NEGLIGENCE—PERSONAL INJURIES—DEFECTIVE HIGHWAY—NOTICE—CONTRIBUTORY NEGLIGENCE.

In an action against the city of Detroit and the street railway company for personal injuries received by plaintiff tripping and falling while attempting to cross a public street while defendants were engaged in repairing the street car track thereon, where it is undisputed that at the time of the accident it was a bright clear day, and that plaintiff had in mind the danger of what she was doing, she was guilty of contributory negligence precluding recovery.

Error to Wayne; Codd (George P.), J. Submitted October 22, 1919. (Docket No. 99.) Decided April 10, 1920.

Case by Catherine Vincent against the city of Detroit and the Detroit United Railway for personal injuries. Judgment for defendants on a directed verdict. Plaintiff brings error. Affirmed.

*Guy A. Miller,* for appellant.

*Thomas P. Penniman (Clarence E. Wilcox,* corporation counsel, of counsel), for appellee city.

*Corliss, Leete & Moody (William E. Tarsney,* of counsel), for appellee railway.

STEERE, J. On November 3, 1916, plaintiff fell and sustained serious injuries to her right foot and ankle, while attempting to cross State street on the west side of Woodward avenue in the city of Detroit, where repairs of a street car track were then in progress and the paving torn up for that purpose. Imputing her accident and resulting injuries to the negligence

of defendants in putting and leaving the street at that point in an unsafe condition for public travel without proper warning or barriers, she brought this action to recover damages for the injuries so sustained. From a directed verdict and judgment for defendants the case has been removed to this court on numerous assignments of error directed to rulings of the court upon the admissibility of testimony, refusal to give plaintiff's requests to charge and the charge as given in directing a verdict for defendants, all centering in substance to whether there was testimony in the case to carry the questions of defendants' negligence and her freedom from negligence to the jury.

Much of the evidence is undisputed. Woodward avenue extends north and south centrally through the city of Detroit, while State street extending east and west crosses it in the down town business portion of the city. Each street has a double street car line upon it. Their intersection is a business location where travel and traffic are congested by passing pedestrians, motor vehicles and street cars on both thoroughfares, particularly in what are called "rush hours," one or more traffic officers being customarily stationed there to control and direct.

That the work in progress upon the streets at the time of the accident was necessary is not disputed. By the franchise agreement between the municipality and company, when it became necessary to make such repairs the excavating and preparation for laying the tracks was done by the city while the repair and replacing of the tracks themselves was done by the street railway company. When this accident occurred the work had been in progress some time, extending from the east curb on Woodward avenue westerly along State street. The city had taken up the old north track and excavated a trench in the pavement where it was removed from, of sufficient depth for an ade-

quate foundation, then filled it with concrete to within 14 inches of the level of the street, leaving a depression or trench of that depth with a level concrete bottom and about 7 feet wide on which to relay the track. In this work the concrete usually set in from 7 to 11 days, after which the tracks could be put in. It was customary in such work for the city to place planks over the crossings and driveways where the tracks were so torn up to "take care of" or accommodate travel. The usual course was followed at this crossing and it had been in that condition for about 10 days before the accident and until about 7 o'clock that morning when the street car company took over the work, removed the planking at the crossing and proceeded to lay the track, a crew first temporarily placing the ties crosswise in the bottom of the trench and the rails lengthwise along them. The rails had not yet been lined up and spiked, but this work had progressed past the west crossing on Woodward avenue at the time plaintiff was injured and the men were at work putting down the ties and rails further west in the same block. The top of the rails on the ties came about level with the pavement and pedestrians traveling the west walk of Woodward avenue continued to pass that way as before, stepping on the ties or bottom of the trench and on or over the rails, without apparent difficulty or accident until plaintiff tripped and fell. The traffic officer who arrived there at 7:30 stated it was a bright clear day, and estimated that about 1,000 people had crossed over there that morning, the majority going south. He saw plaintiff walking with another lady at average speed as they started to cross and noticed her fall forward, her foot apparently catching on the top of the rail and tripping her. There were no cars going east or west on State street at the time. He was about 20 feet away and went to her assistance. She told him her limb pained her very

much and he helped her across State street to Sigel's.

Plaintiff was a single woman over 50 years of age, in good health, then working in Siegel's store at the southeast corner of State street and Woodward avenue, where she had been employed for 9 years. She had lived in Detroit all her life, and was familiar with conditions of traffic and travel in that congested section where she was employed, and had seen the street being torn up and excavated where this work was going on for some days. She came down town that morning to her work as usual from her home on Townsend street in company with a Mrs. Moran (also called Miss McGovern), who lived at the same place and also worked at Siegel's. As was customary, they rode down on a Sherman street car which they left at the Chamber of Commerce building on Griswold street, a block west of Woodward, and walked the short distance east on State street to Woodward, then turned south to cross State street to Siegel's where they were due at 8:30. They could, and plaintiff frequently did, go to the south side of State street at the Griswold crossing which had not been disturbed, but happened to take the north side that morning. Plaintiff testified that they were walking "pretty fast—ordinarily fast," that as they proceeded to cross State street at Woodward she observed the excavation and saw the ties in the bottom and rails upon them, noticed they did not look as though they were spiked, that lots of people were crossing and Mrs. Moran stepped ahead, though she did not watch her as she was paying attention to what she herself was doing; that she knew it was always dangerous where such work was going on, and had that in mind, starting to cross the trench with full understanding of the danger; that she stepped down on a tie and as she was about to step over the rail she heard a rumbling of wheels to the east like a street car, saying, "it excited me and

I gazed up and got my foot caught and lost my balance and fell," that "the best she could tell" she caught her "toe on the top of the rail." The evidence shows the top of the rail was about on a level with the pavement and six inches above the tie it rested on, that being the height of a rail.

The trial court in directing a verdict for defendants designated plaintiff's fall as "an unfortunate accident for which neither of the defendants would be liable" under the undisputed evidence, reviewed to some extent the claims of the respective parties and said in part:

"Such public work is, of course, a necessity and in all cases more or less inconvenience to the public themselves and the public must realize and do realize that they have to inconvenience themselves by reason of public work going ahead. It is impossible to in all instances make a place where such work is going on, of the same character of safety as if no work were going on at all, and I do not believe that as a matter of law such a thing can be expected.

"With reference to the contention that plaintiff was guilty of contributory negligence, the fact of going over this crossing is not necessarily negligence. A thousand people had gone over this place, which fact might have a tendency to show that the place was in a reasonably safe condition for public travel; but that is rather aside the question. The person going over it is not negligent per se. However, they must take into consideration the fact of it being more or less a place of danger and must use the extra care required under circumstances of that sort. In this case the undisputed testimony of the plaintiff and her witnesses is to the effect that this accident was caused by either catching her foot or tripping over the rail which was there and which I cannot find was negligent condition in view of the work which they were compelled to do there. She knew the ties and rails were there and she attempted to step over them. In doing so she caught her foot or tripped over the rail. It is my judgment under the circumstances that I have no right to leave the question of negligence to you."

The court also held that proper notice of claim as required prior to an action for damages had not been given the city; that served being misleading in stating a different proximate cause than was declared upon and indicated by plaintiff's evidence, the notice alleging that she was "led to believe it was reasonably safe" for her to cross, as she was carefully and prudently proceeding to do when the accident for which she claimed damages resulted from her "right foot becoming wedged and caught in a crevice of the pavement," with no claim then made of any diverting sound or circumstance. Her explanation of the variance and omissions in her claim is failure of her former attorney to properly interrogate her on the subject. If, as the court held, plaintiff as a matter of law failed to establish her own freedom from negligence, the question of notice which is argued at length in counsel's briefs becomes unimportant beyond its possible bearing upon her present version of the accident. It is, however, strenuously insisted in her behalf that in any event her negligence was made a question of fact for the jury by her testimony that a sound of car wheels diverted her attention at the time she fell. Numerous cases are cited to the proposition that a person is not necessarily negligent in traveling over a highway or sidewalk because of knowledge that it is defective, if the party with such knowledge exercises such care and caution as a reasonably prudent and careful person would and should exercise in view of the known dangers. In that connection it has been held that if the injured person does not have the defect in mind at the time, or on approaching the locality attention is diverted to other matters to its immediate exclusion, the bare fact of previous knowledge of the defective condition of the way does not conclusively preclude recovery.

In the cases cited by plaintiff's counsel upon those

contentions the controlling facts and circumstances involved will be found materially at variance with those in the instant case. In many of them the accident occurred in the nighttime. Of that class are *Belyea* v. *City of Port Huron,* 136 Mich. 504; *Comiskie* v. *City of Ypsilanti,* 116 Mich. 321; *Styles* v. *Village of Decatur,* 131 Mich. 443; *Barnes* v. *West Bay City,* 138 Mich. 93; *Sherman* v. *Consumers Power Co.,* 199 Mich. 543. In cases where it has been held disturbing and diverting sounds or circumstances raised a question for the jury, the recognized issue apparently was whether thereby recollection or realization of the known defect and danger about to be entered upon temporarily and unavoidably escaped the traveler's field of consciousness. In the instant case plaintiff was by her own testimony in the line of the trench with full knowledge from immediate observation of the conditions and dangers surrounding her. She was familiar with the locality and the sounds and sights of traffic at that corner. With her knowledge of traffic on Detroit streets she presumably knew that the trench where she was protected her from passing street cars or automobiles, and the sound of rumbling car wheels to the east on Woodward avenue carried no menace of a car coming where she was. So far as rendering her temporarily oblivious of conditions at that crossing and the trench over which she was passing, she testified in part as follows:

"And there was nothing in that day but that you were just as cautious as any other day?

"A. I certainly was.

"Q. In fact, you knew that there was construction work going on there?

"A. I did.    *    *    *

"Q. Was there anything that diverted your mind before you put your foot into the excavation?

"A. No, sir, no more than I was going to my work, that is all

"*Q.* You had your mind on the fact that you were going into the excavation?

"*A.* Yes.

"*Q.* And the diversion when it occurred—it occurred after you got into the excavation?

"*A.* It certainly did.   *   *   *

"*Q.* Isn't it a fact that you under-estimated the height of the rail?

"*A.* Yes.

"*Q.* That is what caused you to fall?

"*A.* Yes."

It is undisputed that this repair work in progress was necessary and carried on in the usual way, that as soon as the excavation and concreting were completed by the city at that point it was covered with a temporary walk while the concrete foundation for the track was setting, and that when in condition for track laying to begin it was necessarily uncovered to do the work which was in progress along that trench at the time of the accident. No notice or warning would have furnished the plaintiff any information that she did not possess. She had seen the trench being excavated and the work as it progressed from day to day, knew how to and frequently did go to her place of employment by an equally short route which entirely avoided it, observed as she approached the crossing that morning what was being done and what had been done, and the exact condition at the place she attempted to cross. It was not to her a way of necessity nor a case where to proceed was the only alternative. She testified it was a bright clear morning, that they were not working "right at that place," but were at work in the same block near the Chamber of Commerce, and she observed that while the ties and rails had been placed, the work of putting in the track was not finished. Of this crossing, its condition and dangers she testified on cross-examination:

"I could not help but see it if I was not blind. I had it in mind when I started to cross.

"*Q.* There was nothing that attracted your attention until you got to the excavation you have described?

"*A.* Yes; I knew it was in bad condition. I had that in mind.

"*Q.* And you knew you had to pass there—

"*A.* I knew I had to pass or go in danger if I went outside.

"*Q.* You had that dangerous condition in mind at the crossing?

"*A.* Yes.

"*Q.* And that is true at the moment of the accident?

"*A.* Yes.   *   *   *

"*Q.* You knew you had to be extremely careful in going across there?

"*A.* Yes, anybody would know that."

Just how dangerous it was to a person taking time to pass carefully over it might be questioned, but knowing as she states that it was dangerous, with its condition in mind and sight at the time, she proceeded on her way and chose to risk it. In *Black* v. *City of Manistee*, 107 Mich. 60, it is said:

"Where a person actually sees the danger before the accident, there is as great reason for him to avoid it as there is for the municipality to provide against it beforehand."

Plaintiff's allegation in her declaration that she was free from negligence is not supported by her evidence. We conclude that this case is controlled in principle by *Black* v. *City of Manistee, supra; Grandorf* v. *Railway Co.*, 113 Mich. 496; *Irion* v. *City of Saginaw*, 120 Mich. 295; *Cloney* v. *City of Kalamazoo*, 124 Mich. 655.

The judgment is affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, BIRD, and SHARPE, JJ., concurred.

Justice KUHN took no part in this decision.